IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHERVON HOGSETT, individually,
and as Administratrix of the
Estate of PATRICIA JOYNER,
deceased, and GARY JOYNER,
individually,

            Plaintiffs,

v.

PARKWOOD NURSING &
REHABILITATION CENTER, INC.,
PARKWOOD LIVING CENTER, LLC,
HMR ADVANTAGE HEALTH SYSTEMS,
INC., SCEPTER HEALTH & REHAB OF
SNELLVILLE, LLC, COVENANT DOVE,
INC., COVENANT DOVE, LLC,
COVENANT DOVE HOLDING COMPANY,
LLC, ARK HOLDING COMPANY, INC.,
and ARK HOLDINGS, LLC,

            Defendants.

CIVIL ACTION NO.

1:12-cv-1399-JEC

**AMENDED ORDER & OPINION**

     This case is before the Court on defendants' Motion to Dismiss
or Stay Proceedings and Compel Arbitration [4] and defendant Covenant
Dove Holding Company's Motion to Dismiss for Lack of Personal
Jurisdiction [3].  The Court has reviewed the record and the
arguments of the parties and, for the reasons set out below,
concludes that defendants' Motion to Dismiss or Stay and Compel
Arbitration [4] should be **DENIED** and that defendant Covenant Dove

Holding Company's Motion [3] should be **GRANTED as unopposed**.

<u>BACKGROUND</u>

On March 11, 2010, the defendant long-term care facility Parkwood Nursing and Rehabilitation Center ("Parkwood") admitted 63-year old Patricia Joyner. (Compl. [1] at 8-9.) Doctors had recently amputated the lower part of Joyner's left leg, and the goal of Joyner's stay at Parkwood was for her to regain limited mobility so that she might live on her own with caregiver assistance. (*Id.*) Joyner was listed in "fair" condition upon her arrival at Parkwood, and there is no indication that she was not coherent or that she was unable to make decisions. (*Id.*)

When Joyner was admitted to Parkwood, her daughter Shervon Hogsett signed numerous papers on her mother's behalf, including an arbitration agreement. (Defs.' Mot. to Dismiss or Stay and Compel Arbitration [4] ("Defs.' Mot. to Dismiss") at Exs. A & B.) The arbitration agreement is quite broad, covering all potential disputes related to Joyner's stay at Parkwood, including any contractual disputes or torts.[1] The agreement explicitly provides: "This

---

[1] "<u>Claims Subject To Arbitration</u>: Any and all claims or controversies arising out of or in any way relating to the Resident's stay at the Living Center including the care and treatment received by the Resident at the Living Center shall be submitted to binding arbitration pursuant to the Federal Arbitration Act. This right to demand arbitration includes, without limitation, disputes regarding interpretation of this Agreement, disputes arising under state or federal law, either currently existing or arising in the future,

2

agreement to arbitrate constitutes a waiver of the right to a trial by jury." (*Id.* at Ex. B.)

On the last page of the arbitration agreement, below the sentence "I AGREE TO THE TERMS OF THIS AGREEMENT TO ARBITRATE," there is a line on which the name of the resident is to be printed and a line where the signature of the resident is to be affixed. (*Id.*) On the line calling for the printed name is the correct name of the resident: "Patricia Joyner." (*Id.*) However, the signature line for the resident is blank. (*Id.*) Just below this section, there are two lines for the printed name and signature of the "legal representative/caretaker." (Defs.' Mot. to Dismiss [4] at Ex. B.) These lines contain the printed name and signature[2] of Shervon Hogsett, along with the date "3-11-10." (*Id.*) Finally, just below the lines for the legal representative are two lines calling for the printed name and signature of the Living Center representative, which contain the name "Cara Waiswilos" and the date "3/11/10." (*Id.*)

An admission agreement was also presented to Hogsett for her signature. (*Id.* at Ex. A.) The admission agreement states that the

---

including claims for statutory, compensatory, or punitive damages and claims based on breach of contract, tort, negligence, or breach of statutory duties." (*See* Defs.' Mot. to Dismiss [4] at Ex. B, 1.)

[2] Written in pen next to the signature of Ms. Hogsett is an "x," which presumably was inserted by the Parkwood representative to show Ms. Hogsett where to sign.

term "resident" refers to the resident,

> or where applicable to any person who may under Georgia law, act on the resident's behalf when the resident is unable to act for himself or herself, or where applicable any person who the resident has delegated decision-making authority.  The resident's incapacity or delegation of decision-making authority must be documented in the living center's records in compliance with applicable Georgia statutes.  The resident must provide copies of any existing powers of attorney, court orders or other applicable documentation prior to admission.

(*Id.* at 2.)

The admission agreement contains several pages of information about the care to be provided by the Center, as well as the financial obligations of the resident.  At the conclusion of the agreement, there is an authorization for payment and release of information, with accompanying signature lines.  (Defs.' Mot. to Dismiss [4] at Ex. A, 12.)  The "signature" line was completed by "Shervon J. Hogsett" and witnessed by "CWaisilos."  (*Id.*)  Below the signature is the following admonition:  "**Note**: If the resident is unable to sign, complete authorizing signature Section below."  (*Id.*)  Under that note is a line marked "Authorized Signature and Relationship" and "Reason Resident Could Not Sign."  (*Id.*)  In the block for authorized signature and relationship is the hand-written abbreviation "dtr," which presumably stands for "daughter," and in the block for the reason why the resident could not sign are the hand-written words "not present."  (*Id.*)

4

In short, Hogsett signed the arbitration agreement for her mother, Patricia Joyner. Joyner did not sign any of the admissions paperwork. Although Hogsett signed the agreement under the blank calling for "legal representative/caretaker," the parties agree that Hogsett had no legal status as her mother's representative.[3] That is, Hogsett had no power of attorney nor was she her mother's guardian. Neither is there any indication that Hogsett represented to Parkwood staff that she had any such legal status.

Eight days after Joyner was admitted, her doctor provided Parkwood with a recommendation regarding the treatment of a wound on Joyner's partially amputated left leg. (Compl. [1] at 9.) According to plaintiffs, no one at Parkwood acted on the recommendation between March 19 and March 22, 2010, leading to a deterioration in Joyner's condition. (*Id.*) By the time she received treatment, Joyner's leg was infected beyond repair. (*Id.*) Joyner died in a nearby hospital on March 26, 2010, fifteen days after her admittance to the Parkwood facility. (*Id.*)

Plaintiffs are Joyner's daughter Hogsett and her son Gary Joyner. They have sued defendant Parkwood and affiliated entities, asserting negligence, breach of contract, wrongful death, and other claims. Plaintiffs Hogsett and Gary Joyner have brought the wrongful

---

    [3] Whether Hogsett was her mother's caretaker is not discussed in the briefing.

death claims in their individual capacities.  Plaintiff Hogsett also originally brought claims in her representative capacity on behalf of Joyner's estate, but has now dismissed those claims.[4]

Defendants seek to dismiss plaintiffs' claims and to compel arbitration on those claims based on the agreement signed by Hogsett.[5] Plaintiffs argue that the arbitration agreement is not binding on them, as Ms. Joyner never signed the agreement and as Hogsett had no authority to bind her mother to such an agreement.  Defendants argue that plaintiffs should be bound by Ms. Hogsett's signature on the arbitration agreement.

<u>**DISCUSSION**</u>

I.      <u>**ENFORCEABILITY OF ARBITRATION AGREEMENT AS TO CLAIMS NOT MADE BY PLAINTIFF SHERVON HOGSETT IN HER INDIVIDUAL CAPACITY: THAT IS, ALL ESTATE CLAIMS AND INDIVIDUAL CLAIMS MADE BY GARY JOYNER**</u>

A.      <u>Claims at Issue</u>

As noted above, two types of claims were originally brought in

_____

[4]   Plaintiff Hogsett voluntarily dismissed any estate claims after defendants moved to dismiss those claims for failure to meet Georgia's medical malpractice affidavit requirement.  (*See* Defs.' Mot. to Dismiss [2] and Pls.' Notice of Voluntary Dismissal [5].)

[5]   Defendant Covenant Dove Holding Company also filed a motion to dismiss for lack of personal jurisdiction [3].  Plaintiffs filed two separate consent motions for an extension to respond [9, 13], which were granted by the Court.  The last requested extension expired on September 4, 2012 and plaintiffs still have not responded. Accordingly, the Court **GRANTS** Covenant Dove Holding Company's motion [3] as unopposed.  *See* LR 7.1B, NDGa (failure to file a response shall indicate that there is no opposition to the motion).

6

this case: claims brought on behalf of the estate by its representative Shervon Hogsett and claims brought by the individual plaintiffs, Shervon Hogsett and Gary Joyner. The parties do not address how these claims differ, but as defendants arguably have a stronger ground for compelling arbitration on Shervon Hogsett's individual claims, it is important to have some idea what the differences might be. The Court assumes that estate claims would be those claims that would have been available to Ms. Joyner had she not died, such as any pain and suffering she endured and medical expenses she incurred as a result of the defendants' alleged negligence, as well as any funeral expenses, given that she did, in fact, die. The individual claims would be those claims available to daughter Hogsett and son Gary Joyner based on the death of their mother.

As noted, plaintiff Hogsett, as the representative of the estate, has dismissed all estate claims, apparently because she did not file a medical affidavit as required by Georgia law for medical malpractice claims. *See* O.C.G.A. § 9-11-9.1. Defendants suggest in their briefing[6] that the only remaining claims are the wrongful death

---

[6]   *See generally* Defs.' Reply Br. in Supp. of Their Mot. to Dismiss or Stay Proceedings and Compel Arbitration ("Defs.' Reply Br.") [12] and Mot. to Dismiss [2] at 2 ("The 'Estate claims' include all claims brought on behalf of the Estate of Patricia Joyner by her personal representative or administrator (in other words, all claims in this case other than the wrongful death claims).")(emphasis added).)

claims[7] of the two individual plaintiffs:  Shervon Hogsett and Gary Joyner.  The Court will assume this to be so.

Yet, while it is true that the estate claims are now gone, it is still important to analyze the effect of the arbitration agreement on any such estate claims.  This is so because if the decedent Joyner agreed to arbitrate any claims against defendants, then presumably her survivors on a wrongful death claim would be bound by that agreement as a wrongful death claim would be derivative of the medical malpractice claim that the decedent could have made.  Conversely, if the arbitration agreement is deemed to be invalid and not binding on decedent Joyner or her estate, then it presumably would not be binding on her survivors' individual wrongful death claim.

   B.   <u>Did Hogsett Have the Power to Bind Her Mother to an Arbitration Agreement</u>?

       1.   **Parties' Contentions**

Defendants correctly note that federal law favors the enforceability of arbitration agreements, even if there is arguably inconsistent state law disfavoring arbitration.  *See generally Marmet Health Care Ctr., Inc. v. Clayton Brown*, 565 U.S. ___, 132 S. Ct.

---

   [7]   Implicit in defendants' argument is an assumption that a medical affidavit does not have to be filed in a wrongful death claim, even when the latter claim is based on an act of medical malpractice.

8

1201 (2012)(per curiam)(Federal Arbitration Act permits enforcement of arbitration agreement entered into between residents and nursing homes, despite potentially contrary state law)(citing U.S. CONST., art. VI, cl. 2).  So while Georgia may have a strong interest in protecting its nursing home residents, this policy does not, as plaintiffs suggest, preclude care facilities and their residents from contracting to resolve potential disputes through arbitration.[8]

That said, an arbitration agreement is still a contract and, as such, it requires consent by the parties to the agreement.  Consent to a contract is a matter of state law.  Federal Arbitration Act, 9 U.S.C. § 2 (permitting revocation of arbitration agreement "upon such grounds as exist at law or in equity for the revocation of any contract"); *Ashburn Health Care Ctr., Inc. v. Poole*, 286 Ga. App. 24, 25 (2007)("[a]s the party seeking arbitration, [the defendant] bears the burden of proving the existence of a valid and enforceable agreement to arbitrate. . .[s]uch [an] agreement is, at base, a contract, and the [FAA] does not require parties to arbitrate when they have not agreed to.")(internal cite & quotation omitted).  Thus, before the scope or applicability of the arbitration agreement can be

_____

[8]  Plaintiffs argued that even if Hogsett had authority to sign for Joyner, the arbitration agreement is void because its enforcement would hinder the efficacy of O.C.G.A. § 31-8-100 *et seq*, Georgia's "Bill of Rights for Residents of Long Term Care Facilities."  (Pls.' Resp. [8] at 15-16.)  The *Marmet* decision defeats that argument.  At any rate, the argument is moot given the Court's ruling *infra*.

9

addressed, the party seeking to compel arbitration must first establish that there is an agreement. *TranSouth Fin. Corp. v. Rooks*, 269 Ga. App. 321, 324 (2004)(party seeking arbitration "bear[s] the burden of proof as to all the essential elements of the contract, including the assent to the contractual terms.")

The parties agree that Hogsett signed the arbitration agreement upon her mother's admittance to Parkwood. They disagree, however, about whether that signature gave rise to a valid agreement between decedent Joyner and the defendants.

Plaintiffs argue that Hogsett did not have authority to bind her mother to an agreement to arbitrate potential claims against the defendants. In support of this argument, plaintiffs note that Hogsett did not have a power of attorney agreement for, or guardianship over, her mother. Further, Hogsett stated in her declaration that Joyner had not given her permission to sign the admission documents on her behalf. (Hogsett Decl. [81] at ¶ 11.) Additionally, defendants offer neither an assertion nor any evidence that decedent Joyner had told the Parkwood Center staff that Hogsett could act on her behalf. Finally, defendants have not suggested that Joyner was incapable of making decisions for herself at the time of her admittance, as she was only 63 years old and her particular malady did not implicate any mental functioning on her part.

Defendants counter that even if Hogsett did not have express

10

authority to act as an agent for Joyner, she had implied/apparent authority, and so Hogsett's signature should be construed as binding her mother.   Further, defendants note that while Joyner may not have been present when her daughter signed the admission forms, she never protested either Hogsett's signature on her behalf or her admittance to Parkwood.   (Defs.' Reply Br. [12] at 3-4.)   Thus, according to defendants, Joyner's consent to arbitration is implied from the circumstances.   (*Id.*)

> **2.   Standard for Determining Whether Authority Existed**

As the decedent Joyner never signed the arbitration agreement, her daughter Hogsett's signature on that agreement can bind Joyner and her estate only if Hogsett is deemed to have been an agent of her mother for this purpose.   Under Georgia law, "[t]he relation[ship] of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf."   O.C.G.A. § 10-6-1. Here, there is no indication that Joyner expressly authorized her daughter to agree to arbitrate away any claims that may have arisen during Joyner's stay.   To the contrary, Hogsett has filed a declaration indicating that she did not discuss her signature on the paperwork with her mother and, therefore, express consent by the latter was necessarily lacking.

Defendants do not disagree, but they contend that Hogsett acted

AO 72A
(Rev.8/82)

with implied authority,[9] meaning that Hogsett would still have authority to enter contracts on Joyner's behalf. "[S]uch authority must be based on 'statements or conduct of the *alleged principal* [that] reasonably cause [a] third person to believe that the principal consents to have the act done on [her] behalf by the purported agent.'" *Ashburn*, 286 Ga. App. at 25-26 (quoting *Hinely v. Barrow*, 169 Ga. App. 529, 530 (1984)).   Therefore, for implied authority to have arisen, the decedent Joyner must have given some indication that she agreed to be represented by her daughter Hogsett. *See Barrs v. Acree*, 302 Ga. App. 521, 525 (2010)(implied agency not found where a party "merely assumed" that an agent was acting for another) and *Hinely,* 169 Ga. App. at 530 ("[W]here the only evidence that a person is an agent of another party is the mere assumption that such agency existed, or an inference drawn from the actions of that person that he was an agent of another party, such evidence has no probative value and is insufficient to authorize a finding that

---

[9]   The Court is aware that, from a purist's point of view, "implied authority" and "apparent authority" are two distinct concepts, with implied authority being a form of actual authority and apparent authority constituting a different kind of authority. *See* generally Restatement (Third) of Agency §§ 2.01-2.03 (2006) (discussing the difference between implied authority and apparent authority).   The Georgia caselaw and the Georgia statute cited above collapse the two terms and, whatever distinctions may have originally existed between the two principles, they don't affect the outcome here.   Accordingly, the Court likewise uses the term "implied authority" to reference both implied and apparent authority.

such an agency exists.")

### 3. Whether Hogsett Had Authority to Bind Her Mother to An Arbitration Agreement, Under the Facts of this Case

In the present case, the decedent Joyner never made any statements that would suggest to defendants that her daughter had the authority to bind her to an arbitration agreement. The Court further concludes that, under the circumstances here, defendants could not have inferred an agency relationship for purposes of assuming an agreement to arbitrate.

As to whether Joyner had "by implication" authorized her daughter to sign an arbitration agreement on her behalf, the facts do not support such an inference. As noted, Joyner's daughter signed the document outside the presence of her mother during her admission to the Parkwood facility. (Hogsett Decl. [8] at ¶¶ 5, 13.) Hogsett testified that no one on defendants' staff inquired whether she had authority to sign an arbitration agreement for her mother. (*Id.* at 5.) Defendants have offered no affidavits to the contrary on that point or to establish that staff had asked Joyner whether she consented to having her daughter sign an arbitration agreement.

Even assuming that Joyner must have deduced that her daughter had signed whatever documents Parkwood required for her admission, as Joyner would have known that she had signed nothing, one cannot assume that Joyner would have had the sophistication to understand

13

that, included among the standard medical forms, would be a separate agreement to give up her right to a jury trial should the rehabilitation center be guilty of negligence.  Indeed, as defendant has conceded, Joyner's consent to the arbitration agreement was not a prerequisite to her admission, and she would have been admitted to the facility even had she known about the arbitration agreement and had refused to sign it.  (*See* Defs.' Mot. to Dismiss [4] and Reply Br. [12].)

Moreover, even as to the admission document, defendants could not have inferred authority under a necessity-type of principle, which arguably might arise--at least as to the signing of the standard admission forms, if not an arbitration agreement--had Joyner been too ill to sign any forms at the time of her admission.  Joyner was only 63 years old and, while she had previously had part of her leg amputated, there is no evidence to suggest that the Parkwood staff perceived her to be mentally or physically incompetent to sign such a document.

Certainly, it would be an unwise policy to require a nursing home or rehab center to turn away a patient in need of treatment who is physically or mentally unable to sign an admission form.  Medical crises can arise suddenly and not all persons have prepared for such occasions by previously executing health care powers of attorney. Aware of the difficulties that such situations present, the Georgia

14

legislature has enacted a statute that seeks to address this potential problem. O.C.G.A. §§ 31-9-2(a)(1) and (1.1) provides that consent for medical treatment can be given by an adult person for himself or by any person having a durable power of attorney for health care. The statutes goes on to provide that, where there is no power of attorney, a spouse may give consent for treatment, as may the parent of a minor child or a person temporarily acting in loco parentis, even without formal credentials. O.C.G.A. §§ 31-9-2(a)(2)-(4). Finally, where the patient is unable to consent for himself and where there is no other individual who fits within the categories identified above, an adult child, among others, may consent for treatment for her parent. O.C.G.A. § 31-9-2(a)(6)(A).

It is uncertain that Hogsett's signature would have satisfied O.C.G.A. § 31-9-2's requirements for consent to medical treatment, as there has been no effort by the defendants to argue or show that Joyner was unable to consent for herself. Even had Hogsett's consent been valid under this statute, however, the statute addresses consent to medical treatment, not consent to submitting to arbitration any claims of negligence against the rehab center.[10]

---

[10] The Georgia Senate recently considered legislation that would permit a wide-ranging group of people other than the resident to consent to arbitration of claims against nursing-home or rehab center types of facilities. *See* S.B. No. 202, GA 152d GEN. ASSEMB. - 2013-2014, REG. SESS. (Feb. 22, 2013), Proposed § 31-8-128(f)(6). Had this proposed statute been in effect when Joyner was admitted, then her

AO 72A
(Rev.8/82)

Finally, to the extent that defendants recognized an "implied" authority for Joyner's daughter to sign the arbitration agreement, inasmuch as she had signed the admission paperwork, they did so in contravention of their own contractual representation that such a status could not be imputed without compliance with the requisite legal requirements. Specifically, the admission agreement drafted by Parkwood and executed by Hogsett indicates that, when pertinent, a resident's "incapacity or delegation of decision-making authority must be documented in the living center's records in compliance with applicable Georgia statutes." (Defs.' Mot. to Dismiss [4] at Ex. A (emphasis added).) There is no such documentation of Joyner's incapacity nor any assertion by defendants that she was, in fact, incompetent to sign the arbitration agreement.

### 4. Analogous Georgia Caselaw is Consistent With this Interpretation

This Court's decision is in accord with Georgia caselaw that has considered the issue of implied authority as it pertains to family members signing arbitration agreements for relatives who are admitted to nursing homes. In *Life Care Ctrs. of Am. v. Smith*, 298 Ga. App. 739 (2009), the defendant nursing facility sought to enforce an arbitration agreement signed by the resident's daughter. At the time

daughter's consent to arbitration would be valid. However, the statute was not then in effect, and in fact was not enacted.

the daughter signed the arbitration agreement, she had no general power of attorney, but only a durable power of attorney for health care decisions. The court of appeals found the agreement unenforceable in the later tort action against the nursing home because the daughter did not have the general power of attorney necessary to agree to submit the mother to arbitration. The court distinguished between the authority to seek medical care for another versus the authority to bind that other person to arbitration.

Similarly, in *Ashburn Health Care Ctr., Inc. v. Poole*, 286 Ga. App. 24 (2007), a husband signed an arbitration agreement upon his wife's admission to a nursing home. Although the husband did not hold power of attorney for his wife, he nevertheless signed the agreement above a line listing him as an "authorized representative" of the wife. *Id.* at 26. The court of appeals held that the husband did not have actual or apparent authority to sign the arbitration agreement on behalf of his wife, and that the agreement was therefore unenforceable.[11]

---

[11] Cases from other states that are in accord with *Ashburn* and *Smith* include: *Giordano ex rel. Estate of Brennan v. Atria Assisted Living, Virginia Beach, L.L.C.*, 429 F. Supp. 2d 732, 738 (E.D. Va. 2006)(no mutual assent to arbitration where "[mother] did not sign the Residency Agreement; she did not give consent to [her daughter] to sign the Residency Agreement; [mother] did not discuss with [her daughter] whether the agreement would be beneficial to her; and, there is no proof that [the mother] was, in fact, aware that the Residency Agreement existed."); *McNally v. Beverly Enters., Inc.*, 191 P.3d 363 (Kan. Ct. App. 2008)(wife signed arbitration agreement on

Defendants do not address *Smith* or *Ashburn* in their Reply brief, suggesting a tacit recognition that controlling Georgia authority disfavors their arguments concerning implied authority. Moreover, as there is no binding arbitration agreement between the defendants and Joyner's estate, there would appear to be no theory under which the

_____

behalf of husband but only had durable power of attorney to make medical decisions, and so no actual or implied authority existed); *Barbee v. Kindred Healthcare Operating, Inc.*, No. W2007-00517-COA-R3-CV, 2008 WL 4615858, at *6-9 (Tenn. Ct. App. Oct. 20, 2008) (decedent's son who signed arbitration agreement upon parent's admission but did not have power of attorney lacked actual or implied authority to act as agent); *Trinity Mission of Clinton, LLC v. Barber*, 988 So.2d 910, 916 (Miss. Ct. App. 2007)(invalidating arbitration agreement and noting that the principal must hold the agent out as having authority); *Sikes v. Heritage Oaks W. Ret. Vill.*, 238 S.W.3d 807 (Tx. Ct. App. 2007)(finding arbitration agreement unenforceable where wife of resident signed admissions documents, purporting to have power of attorney which she did not possess).

Some courts have concluded that a family member *can* enter into an arbitration agreement on behalf of a relative without having explicit power of attorney or guardianship, but generally only where there is some evidence that the admitted individual gave permission to the signee to enter into agreements on his behalf. *See Carraway v. Beverly Enters. Ala., Inc.*, 978 So.2d 27, 30-31 (2007)(brother who subsequently attained power of attorney could enter into arbitration agreement on behalf of sister where "[t]he arbitration agreement did not call for the signature of a legal representative; instead, it provided that 'a person duly authorized by the Resident' could sign the agreement on the resident's behalf"); *Ruesga v. Kindred Nursing Ctrs., L.L.C.*, 215 Ariz. 589, 595-597 (Ariz. Ct. App. 2007)(husband empowered his wife to enter arbitration agreement on his behalf, but only after defendant nursing home presented extensive evidence that the husband authorized wife in the past to make medical decisions on his behalf); *Necessary v. Life Care Ctrs. of Am., Inc.*, No. E2006-00453-COA-R3-CV, 2007 WL 3446636, at *5 (Tenn. Ct. App. Nov. 16, 2007)(arbitration agreement entered into on behalf of husband upheld where husband had expressly authorized his wife to enter into other agreements on his behalf).

18

individual wrongful death act claim of Joyner's surviving son Gary would be subject to a now-invalidated arbitration agreement. Certainly, defendants advance no arguments.  The Court thus concludes that the individual claims of surviving son Gary Joyner are not subject to the arbitration agreement signed by Hogsett.  Further, had the estate claims originally made in the complaint not been dismissed by plaintiffs, they would also not be subject to the arbitration agreement.

II. **ENFORCEABILITY OF ARBITRATION AGREEMENT AS TO CLAIMS MADE BY PLAINTIFF SHERVON HOGSETT IN HER INDIVIDUAL CAPACITY**

As noted, plaintiff Shervon Hogsett, the daughter of the deceased Patricia Joyner, has brought claims on her own behalf as a result of her mother's death.  These claims appear to be wrongful death claims.  Defendants argue that even if Patricia Joyner did not agree to arbitration, Hogsett unquestionably signed the arbitration agreement, so at least her own claims should be subject to arbitration.  (Defs.' Reply Br. [12] at 10-11.)  Although there is no authority directly on point, defendants' argument conflicts with several general principles of Georgia contract and wrongful death law.

As an initial matter, it is clear that had the arbitration agreement been deemed to be enforceable as to the decedent Joyner and her estate, then it also would have been enforceable as to any

19

individual wrongful death claims brought by her survivors, regardless of whether any of those survivors had signed the agreement. *Cf. Turner v. Walker Cnty.,* 200 Ga. App. 565, 566 (1991)(although the cause of action created by the wrongful death statute is a different action than the one the decedent would have possessed against a tortfeasor, any defense which would have been good against the decedent also applies to any persons bringing a wrongful death action); *accord Mowell v. Marks,* 269 Ga. App. 147, 151 (2004).

In short, as a wrongful death claim is a derivative claim that takes on all defenses available against the decedent, if the decedent was unable to prevail in a tort claim based on the conduct that led to her death, then her survivors would likewise be estopped. Here, the question is the converse of the above. Specifically, if a defendant's defense[12] would <u>fail</u> against a decedent, would that same defense also fail as to a survivor asserting a wrongful death claim based on the same conduct? More specifically, if a decedent could defeat a tort defendant's argument that she had agreed to arbitrate the claim, would the survivor of the decedent likewise succeed on an argument that the arbitration agreement in question was not binding on that survivor? The parties cite no case authority on this precise

---

[12]   The word "defense" here meaning that the defendant could insist on arbitration of the claim, instead of a trial, as sought by the plaintiff.

point, but it seems reasonable to assume that a survivor's claim would not be subject to an arbitration agreement entered into on behalf of the decedent, if the decedent, herself, would not have been so bound.

Indeed, there is no contractual basis for inferring an intent on the part of Ms. Hogsett, the daughter of the deceased, to arbitrate her wrongful death claim. As discussed above, consent to arbitrate is an essential component of an enforceable arbitration agreement. *Ashburn,* 286 Ga. App. at 25. It is apparent from the language of the arbitration agreement that Hogsett did not sign the agreement in her individual capacity. (Defs.' Mot. to Dismiss [4] at Ex. B.) Rather, the agreement expressly purports to govern the relationship between the "Resident" (Joyner) and the "Living Center" (Parkwood). (*Id.*) Hogsett did not, by signing the agreement in her representative capacity on behalf of her mother, express an intent to surrender any rights she might possess in her individual capacity. In the absence of Hogsett's consent to arbitrate, the Court cannot enforce the agreement against her. *See Sikes,* 238 S.W.3d at 810 ("[T]he arbitration agreement is unenforceable against [the daughter] in her individual capacity because there is no evidence that she signed in that capacity.").

This result is in accord with the Georgia wrongful death

21

statute, O.C.G.A. § 51-4-2.[13]   That statute permits the surviving child or children of a decedent to bring a wrongful death action in the event that there is no surviving spouse.[14]  O.C.G.A. § 51-4-2(a). Any amount recovered in such an action must be "equally divided" between the children "per capita."  O.C.G.A. § 51-4-2(d).  The statute thus contemplates one indivisible claim, the proceeds of which are to be divided between all surviving children. Requiring Hogsett, the daughter of the decedent, to arbitrate her claim against defendants, when her brother, the son of the decedent, would be simultaneously proceeding by trial, would not be workable and would arguably subvert the intent of the statute.

Finally, the Court rejects defendants' estoppel and ratification arguments.  Plaintiff's signature of the arbitration agreement, ostensibly in her representative capacity, does not "as a matter of equity and good conscience" preclude plaintiff from pursing a wrongful death claim in her individual capacity. *Hollifield v. Monte Vista Biblical Gardens, Inc*., 251 Ga. App. 124, 126 (2001).  This is particularly so where defendants did not comply with their own

_____

[13]   The statute actually speaks of "homicide" rather than "wrongful death."  "Homicide" in this context includes death from "(1) a crime, (2) criminal negligence or (3) other negligence." *Stiltjes v. Ridco Exterminating Co. Inc.,* 256 Ga. 255, 257 (1986).

[14]   The decedent did not have a surviving spouse.  (Pls.' Mot. to Amend [16] at 2.)

22

procedures for documenting plaintiff's authority to act on Ms. Joyner's behalf. (Defs.' Mot. to Dismiss [4] at Ex. A, 2.) *Id.* ("The party asserting the benefit of estoppel must have acted in good faith and in the exercise of reasonable diligence.").

Ratification is similarly inapplicable. Defendants contend that Hogsett ratified the arbitration agreement by asserting breach of contract claims on behalf of Joyner's estate. As discussed, Hogsett has voluntarily dismissed the estate's breach of contract claims and is now pursuing a non-contractual wrongful death claim. Hogsett's tort claim does not depend on enforcement of the contract. *See Sikes,* 238 S.W.3d at 810 ("nonparties generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law").

As to the request for discovery on the authority issue, defendants do not adequately explain what they hope to discover. Defendants do not allege that Hogsett had a guardianship or power of attorney that would have sufficed to provide express authority for her to act as Joyner's agent. As to implied authority, defendants' own staff would presumably have the best knowledge of any supporting facts because that type of authority would be established by Joyner's statements or conduct that led the Parkwood staff to believe that she consented to the agency relationship. Defendants have not produced any staff testimony to suggest that there was implied authority. In

23

addition, it is undisputed that defendants did not follow their own procedures for documenting Hogsett's authority to act on behalf of Joyner at the time of her admission into Parkwood. Under the circumstances, the Court does not believe that discovery is warranted.

**CONCLUSION**

For the reasons stated above, the Court **DENIES** defendants' Motion to Dismiss and Compel Arbitration [4] and **GRANTS as unopposed** defendant Covenant Dove Holding Company, LLC's Motion to Dismiss for Lack of Personal Jurisdiction [3]. The Court **DIRECTS** the parties to submit a joint preliminary report and discovery plan by **Monday, March 17, 2014**. The Court further instructs the parties and the Clerk that this Amended Order should supplant the Court's previous Order [15] addressing the Motions to Dismiss [3] and [4].

SO ORDERED, this 14th day of February, 2014.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

24

AO 72A
(Rev.8/82)